Argued and submitted May 15, affirmed June 28, 2000

Daniel L. JORDAN,
*Respondent,*

*v.*

Kathy M. JORDAN
and John Jordan,
*Appellants.*

(98-07-29891E; CA A107620)

8 P3d 229

Martin Leuenberger argued the cause and filed the brief for appellants.

Carol DeHaven Skerjanec argued the cause and filed the brief for respondent.

Before Landau, Presiding Judge, and Linder and Brewer, Judges.

BREWER, J.

**BREWER, J.**

Defendant John Jordan[1] appeals from a final judgment quieting plaintiff's title to five unpatented lode mining claims. The decisive question on appeal is whether the lands on which the parties' overlapping claims were located was open to appropriation when plaintiff located his claims. We review *de novo*, ORS 19.415(3), and affirm.

The trial court's judgment was based on the following written stipulation of the parties:

"1.   Plaintiff, on September 1, 1996, after noon Mountain Time, located 17 lode mining claims in Malheur County, Oregon. * * *.

"2.   On October 11, 1998, [defendant] located five mining claims in Malheur County, Oregon * * *.

"3.   The lands upon which both Plaintiff's and [defendant's] claims were located are owned by the United States of America and, subject to the laws of the United States of America and the State of Oregon, are subject to mineral appropriation.

"4.   The claims of the Plaintiff and [defendant] overlap and are competing.

"5.   Prior to the location of claims by the Plaintiff and [defendant], the minerals on the lands which Plaintiff and [defendant] filed claims had been appropriated by Jordan Mines, Inc. [the corporation].

"6.   [The corporation] at a shareholders meeting on July 6, 1996, voted to end its corporate existence by formally dissolving effective September 1, 1996. * * *.

"7.   Plaintiff and [defendant] were shareholders in [the corporation] at the time of the vote to dissolve the corporation on September 1, 1996.

"8.   [The corporation] notified the Secretary of State of the dissolution by filing Articles of Dissolution which were recorded in the Secretary of State's office on September 20, 1996. * * *.

---

[1] We use the term defendant only to refer to defendant John Jordan. His codefendant, Kathy Jordan, does not assert an interest in the claims on appeal.

"9. [The corporation] failed to pay the annual rental of $100.00 per claim to the [Bureau of Land Management (BLM)] and failed to file proof of labor in Malheur County, Oregon prior to 12:00 p.m. on September 1, 1996, or at any time thereafter.

"10. Both Plaintiff and [defendant] complied with applicable federal and state law in filing their claims with regard to discovery of minerals, monumentation, and appropriate placement and filing of paperwork, and payment of requisite fees to the [BLM].

"11. On September 3, 1996, Defendant Kathy Jordan had filed for record in the mining records of Malheur County, Oregon, location notices for mining claims known as Freedom 1 through Freedom 15. Notwithstanding those filings, Kathy Jordan claims no interest in any of the property covered by Plaintiff's claims.

"12. The only question for the court to determine is whether or not the land upon which the claims were filed was open to appropriation by either the Plaintiff or the [defendant] on the date that Plaintiff or [defendant] filed their respective claims."

In addition to their written stipulation, the parties filed trial briefs that included the following evidence that was "accepted" by both parties and considered by the trial court. The fees that the corporation failed to pay were payable in advance for the mining assessment year, commencing at noon on September 1, 1996, and ending at noon on September 1, 1997. In 1996, September 1 fell on a Sunday. The applicable BLM office was closed for the Labor Day holiday in 1996 from Saturday, August 31 through Monday, September 2.

At trial, plaintiff argued that the disputed lands were available for mineral appropriation when he located his claims on the afternoon of September 1, 1996, because the corporation's claims were forfeited when it failed to timely pay its required annual maintenance fees. Defendant responded that, because the mining year ended on Labor Day weekend, the corporation was entitled by BLM administrative rule to pay the fees on or before Tuesday, September 3. According to defendant, the corporation's claims remained

intact until the end of the grace period and, therefore, plaintiff's location of a competing claim on September 1 was a nullity. As a consequence, defendant reasoned that the disputed property was subject to appropriation when he filed his own claims in October 1998.

After it considered the parties' written submissions and heard oral argument, the trial court issued a written opinion in plaintiff's favor. The court ultimately concluded that

"if [the corporation] had filed the maintenance fees on September 3, the payment would have been *deemed to be timely filed.* In other words, it would have been deemed to have been paid on August 31 just as a payment mailed and postmarked on or before August 31 would have been deemed to have been paid on August 31. This provision does not change the mining year, nor does it extend the life of a claim that would have otherwise expired at noon September 1. When the maintenance fees were not paid on August 31, 1996 or on September 3, 1996, the mining claims expired effective September 1 at noon when the new mining year began." (Emphasis in original.)

Defendant appeals from the ensuing judgment.

On appeal, defendant renews the arguments that he made to the trial court. At the heart of his position is the notion that a regulatory grace period permitting late payment of claim maintenance fees for the 1996-97 assessment year extended the existence of the corporation's claims beyond noon on September 1 and, thus, precluded plaintiff from filing valid competing claims before the grace period expired on September 3. The parties agree that, if the corporation retained ownership of its claims during the grace period, plaintiff's claims would be invalid, even though they were filed more than two years before defendant's overlapping claims were filed. *See Swanson v. Sears*, 224 US 180, 181, 32 S Ct 455, 56 L Ed 721 (1912); *Inman v. Ollson*, 213 Or 56, 64-65, 321 P2d 1043 (1958). If, on the other hand, the corporation's claims were forfeited on or before noon on September 1, 1996, plaintiff's claims are valid and defendant's later-filed competing claims are invalid.

A brief explanation of the nature and history of the maintenance fee requirement for federal mining claims is helpful to a resolution of the parties' dispute:

"Under the Mining Act of 1872, unpatented mining claimholders could maintain ownership of their claims by performing $100 of assessment work or providing $100 of improvements for each claim during each year (referred to as the 'assessment year'). An Act to Promote the Development of the Mining Resources of the United States, ch. 159, § 5, 17 Stat. 91, 92 (1872) (codified at 30 U.S.C. § 28). In 1976, Congress passed the Federal Land Policy and Management Act of 1976 ('FLPMA'), Pub. L. No. 94-579, 90 Stat. 2743 (codified at 43 U.S.C. §§ 1701-1782), which further required unpatented mining claimholders to file annually a notice of intention to hold the claim, an affidavit of the assessment work performed on the claim, or a BLM reporting form. 43 U.S.C. § 1744 (a). Failure to comply with the filing requirement 'shall be deemed conclusively to constitute an abandonment of the mining claim . . . by the owner.' 43 U.S.C. § 1744 (c).

"In 1992, Congress passed appropriations legislation for the Interior Department, which substituted a $100 per claim 'maintenance fee' for the $100 of assessment work requirement * * * . Failure to pay the fee 'shall conclusively constitute a forfeiture of the unpatented mining claim . . . by the claimant and the claim shall be deemed null and void by operation of law.' 30 U.S.C. § 28i." *Kunkes v. United States*, 78 F3d 1549, 1551 (Fed Cir), *cert den* 519 US 820 (1996).

It is undisputed that the corporation's claims were forfeited pursuant to 30 USC section 28i as a result of its failure to pay the maintenance fee for the 1996-97 assessment year. The question is when that forfeiture occurred. The

---

[2] All references to federal law in this opinion are to versions of statutes and regulations that were in effect during the relevant assessment years. The 1992 appropriations legislation applied only to the 1993-94 and 1994-95 assessment years. Department of the Interior and Related Agencies Appropriations Act, 1993, Pub L 102-381, 106 Stat 1374, 1378 (1992). However, the maintenance fee system for preserving and extending unpatented claims annually has since been continued through and beyond the relevant assessment years in this case. Omnibus Budget Reconciliation Act of 1993, Pub L 103-66, Title X, Subtitle B, § 10101, 107 Stat 312, 405 (codified at 30 USC § 28f(a) (1988 & Supp 1993)).

answer to that question lies in the provisions of the 1992 federal act and in the BLM regulations implementing that legislation.

■■ According to BLM regulations, an assessment year "commences at 12 o'clock noon on September 1st of each year." 43 CFR § 3833.0-5(n). 30 USC section 28f provides for the payment of claim maintenance fees for each assessment year:

"(a) Claim maintenance fee

"* * * * *

"The holder of each unpatented mining claim, mill, or tunnel site, located pursuant to the mining laws of the United States, whether located before or after October 21, 1998, shall pay to the Secretary of the Interior, on or before September 1 of each year * * * a claim maintenance fee of $100 per claim or site. * * *

"(b) Time of payment

"* * * * *

"The claim maintenance fee payable pursuant to subsection (a) of this section for any assessment year shall be paid before the commencement of the assessment year, except that for the initial assessment year in which the location is made, the locator shall pay the claim maintenance fee at the time the location notice is recorded with the [BLM]."

The BLM regulation implementing 30 USC section 28f, provides:

"Under the Act of August 10, 1993, a nonrefundable maintenance fee of $100.00 for each mining claim, mill site, or tunnel site shall be paid annually on or before August 31 for the subsequent assessment year beginning at 12 o'clock noon on September 1 of that year. The first payment will be due on or before August 31, 1994, with payments due for each August 31 through August 31, 1998." 43 CFR § 3833.1-5(b).

In order to be timely filed, the maintenance fee was required to be paid at the BLM's Portland office[3] in accordance with 43 CFR section 3833.0-5(m):

---

[3] *See* 43 CFR § 3833.0-5(g); 43 CFR § 1821.2-1(d).

*"File* or *filed* means being received and date stamped by the proper BLM office. For purposes of complying with §§ 3833.1-2, 3833.1-3, 3833.1-5, 3833.1-6, 3833.1-7, or 3833.2, a filing or fee required by any of these sections is timely if received within the time period prescribed by law, or, if mailed to the proper BLM office, is contained within an envelope clearly postmarked by a bona fide mail delivery service within the period prescribed by law and received by the proper BLM State Office by 15 calendar days subsequent to such period, *except as provided in section 1821.2-2(e) of this title if the last day falls on a day the office is closed."* (Final emphasis added.)

43 CFR section 1821.2-2(e) provides the grace period for late payment on which defendant relies:

"Any document required by law, regulation or decision to be filed within a stated period, the last day of which falls on a day the office is officially closed, shall be deemed to be timely filed if it is received in the proper office on the next day the office is open to the public."

Time is of the essence in the enforcement of annual regulatory deadlines under the federal mining law; a filing that is even one day late is untimely and generally results in a forfeiture of the claim. *United States v. Locke,* 471 US 84, 105 S Ct 1785, 1796, 85 L Ed 2d 64 (1985); *Gammelgaard v. Hillis Peak Enterprises, Inc.,* 116 Or App 641, 645, 842 P2d 457 (1992), *rev den* 316 Or 527 (1993). Defendant is correct that the corporation *could have* paid its 1996-97 annual maintenance fee as late as September 3, in accordance with 43 CFR section 1821.2-2(e). However, it does not follow that the regulatory grace period is of any consequence in this case, in light of the corporation's failure to take advantage of it.

Under 43 CFR section 1821.2-2(e), if the corporation had made its annual payment on or before September 3, the payment would have been "deemed to be timely filed." In other words, the payment for the 1996-97 assessment year would have been treated as if it had been made on August 31 and not on a later date. But in this case, the corporation did not pay the maintenance fee for 1996-97 either before or during the grace period. In defendant's view, the corporation nonetheless remained the owner of the disputed claims for the first three days of the 1996-97 assessment year—even

though the maintenance fee for that year was never paid—because payment was due on a day when the BLM office was closed. Defendant's argument attempts to transmute the grace period for making a late payment into a *de facto* extension of the previous assessment year. However, under 43 CFR section 3833.0-5(n), the 1996-97 assessment year began at noon on September 1. Its commencement was not deferred by the existence of a grace period for late payment.

Defendant misconceives the nature of a grace period. It is, generally speaking, a device that permits the relation back to an earlier date of a legally significant act. *See, e.g., Jarrett v. US Sprint Communications Co.*, 22 F3d 256, 259 (10th Cir), *cert den* 513 US 951 (1994) ( payment of court filing fee); *In re Arnett*, 731 F2d 358, 362 (6th Cir 1984) (perfection of security interests under bankruptcy law). As such, it has meaning only if it is used. A payment made after the expiration of a grace period or, as in this case, a payment that was never made at all, has no logical bearing on the expiration of the underlying deadline; it cannot be "deemed to be timely filed" and thus cannot effectuate a relation back.

Because the corporation made no payment for the 1996-97 assessment year, its claims were forfeited at the end of the prior assessment year—in other words, at noon on September 1, 1996. Therefore, the trial court correctly concluded that the disputed mining rights were open to appropriation when plaintiff located his claims after noon on September 1, 1996. Because his claims were valid when filed, the trial court did not err in quieting title in plaintiff's favor.

Affirmed.